## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SARA VALINEJAD LEJUEZ,** | ) |
| | ) |
| **Address:** | ) |
| **4500 Bob Billings Parkway** | ) |
| **Unit 205** | ) |
| **Lawrence, KS 66049** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No.: _____** |
| | ) |
| **BROADCASTING BOARD OF** | ) |
| **GOVERNORS,** | ) |
| | ) |
| **Address:** | ) |
| **330 Independence Avenue, SW** | ) |
| **Washington, D.C. 20237** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Sara Valinejad Lejuez ("Ms. Lejuez"), by her undersigned counsel, hereby files this Complaint and Demand for a Jury Trial and states:

## PARTIES

1.    Plaintiff Sara Valinejad Lejuez, currently a resident of Kansas, is a U.S. citizen who is originally from Iran. From 2008 to 2017, she worked at Voice of America Persian Service, a U.S. entity overseen by Broadcasting Board of Governors.

2.    Defendant Broadcasting Board of Governors ("BBG" or "Agency") is a Federal Agency responsible for all U.S. government and government-sponsored non-military international broadcasting. BBG oversees a number of individual U.S. broadcasting

entities, including Voice of America Persian Services.   BBG is located at 330 Independence Avenue, SW, Washington, D.C. 20237.

### JURISDICTION

3.   This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

### VENUE

4.   Venue is proper in this Court pursuant to 28 USC § 1391(b)(1) & (2) as the subject unlawful acts of employment discrimination, harassment and retaliation occurred in the District, and Defendant BBG, the managing entity of Voice of America Persian Services, is located in the District.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.   Title 29 C.F.R. § 1614, *et seq*., governs complaints of discrimination and retaliation made by federal employees against federal agencies.   Section 1614.105(a)(1) requires an employee to seek informal counseling with an EEO office within 45 days of the occurrence of the matter or action alleged to be discriminatory.   If the EEO office cannot resolve the claim, the employee must thereafter file a Formal Complaint, which the Agency proceeds to investigate.   Section 1614.407(b) provides that an employee may file a civil action under Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act in the U.S. District Court 180 days from the filing of a Formal Complaint if the Agency has not taken final action.

6.   Per 29 C.F.R. § 1614, *et seq*., Ms. Lejuez has exhausted all applicable administrative remedies prior to filing this action.   Specifically, on April 30, 2015, Ms. Lejuez timely sought EEO informal counseling with the BBG Office of Civil Rights for

actions by Defendants giving rise to this suit.  Thereafter, on August 7, 2015, she timely filed a Formal Complaint with the Agency.  The Reports of Investigation in this matter were issued on January 20, 2016 and July 16, 2016.  As to each claim that arose post-August 7, 2015, Complainant has amended the Formal Complaint to include the like and related allegations of retaliation for engaging in protected EEO activity; retaliatory hostile work environment; discrimination on the basis of disability; and failure to provide reasonable accommodations.  On August 3, 2016, Ms. Lejuez requested a hearing before an EEOC Administrative Judge on her amended Formal Complaint, which request was still pending when this action was initiated.[1]  The Agency has yet to issue a final action.  Thus, Ms. Lejuez has exhausted all administrative remedies in relation to the subject claims and has met the administrative prerequisites to bringing this civil action.

## FACTUAL ALLEGATIONS

Ms. Lejeuz's Background

7.    Ms. Lejuez, 41 years old, is a native of Iran and speaks fluent Farsi.  Ms. Lejuez came to the United States in 1995 to study at the University of Maryland, Baltimore County ("UMBC"), while her parents and siblings remained in Iran.  Ms. Lejuez earned a Bachelor of Arts degree in psychology from UMBC.  In 2004, she became a naturalized U.S. citizen.

8.    In 2002, Ms. Lejuez began working as a Programming Director at Radio Farda, a government-funded, non-profit entity supervised by BBG that broadcasts 24 hours a day in Farsi to Iran.  Ms. Lejuez was one of a small group of key employees responsible for

---

[1] Ms. Lejuez will provide notice to the EEOC Washington Field Office of the filing of this action.

launching Radio Farda.  Her responsibilities included designing the news and roundtable discussion programs for the station, as well as cultural and entrainment programs.  Ms. Lejuez excelled at her position, receiving a rating of "exceeds expectations" each year and was designated "Employee of the Year" in 2005.  Radio Farda went on to become the most popular outside-border media outlet in Iran.

Ms. Lejuez's Employment at VOA Persian Service

9.   In 2008, Ms. Lejuez left Radio Farda to work for the VOA Persian Service – known then as the VOA Persian News Network – an entity overseen by BBG.  According to its Mission Statement, VOA is committed to informing, engaging, and connecting people around the world in support of freedom and democracy.  In support of that mission, VOA Persian Services provides a variety of programs to viewers in Iran, including "hard news" shows, roundtable discussions on political, economic and social issues and entertainment-style or cultural shows.   As such, VOA Persian Service is critically important to U.S. government efforts to provide fair, comprehensive and balanced news and other information to the people of Iran, where the state-owned media is heavily censored.  Indeed, for many in Iran, VOA Persian Service is the principal source of news and objective reporting regarding, *inter alia*, human rights and women's issues in Iran; U.S.-Iran relations; and political developments of international or regional significance. Particularly over the past several years, when U.S.-Iran relations have assumed such critical importance, VOA Persian Services has been a key instrument of U.S. policy toward Iran – the means, essentially, by which the U.S. Government speaks to the Iranian people.

10.     Because of her commitment to democracy, human rights, women's rights, freedom of expression and freedom of religion, Ms. Lejuez was deeply attracted to the important work done at VOA Persian Service.  In fact, her work at VOA Persian Service was the fulfillment of her lifelong commitment to bring desperately needed change to Iran, where her family still resides and remains subjected to various forms of brutal oppression.

11.     This decision to work at VOA Persian Services to fulfill this commitment came at a cost, however – by her affiliation with VOA Persian Services, Ms. Lejuez has been barred, as a practical matter, from ever returning to her native country, absent a wholesale change in Iran's system of government and relationship to the U.S.  In fact, VOA Persian Service is considered an "enemy station" by the Government of Iran which routinely attempts to jam its broadcasts.  Were Ms. Lejuez to try to travel to Iran, she no doubt would be detained upon entry.  The personal implications of her affiliation with VOA Persian Service have been profound as well – when her aging parents become ill, or when family events of significance occur, she will not be able to return to Iran to be present.

12.     When Ms. Lejuez began at VOA Persian Service in 2008, she was a contractor. In 2012, she was hired as a full-time employee in the role of News Producer (GS-12) where her main responsibilities were to oversee all aspects of the production, content, and execution of multiple news broadcasts each day.  During this period as News Producer, Ms. Lejuez worked closely with Dr. Setareh Sieg, who was at the time host of *News Hour*. Unfortunately, Dr. Sieg created a highly abusive work environment.  She would routinely ridicule and bully Ms. Lejuez, regaling her for the slightest misstep, humiliating her in

front of her colleagues.   Dr. Sieg would then apologize profusely, professing intense devotion to Ms. Lejuez, but soon revert to more screaming and abuse.

13.   The cumulative effect of this routine abuse from Dr. Sieg eventually became too much for Ms. Lejuez to bear.   Ms. Lejuez, who had never before seen a psychiatrist, was diagnosed with, *inter alia*, depression and anxiety, including major depressive disorder and panic disorder with panic attacks.   Numerous times, Ms. Lejuez collapsed at the workplace due to the unrelenting abuse, unable to breathe due to a panic attack.   In fact, on some five separate occasions, Ms. Lejuez had to be taken to the emergency room by ambulance from VOA Persian Services after suffering such attacks.   Matters reached the point where personnel at the nursing station at the VOA communicated to VOA Persian Service management that Ms. Lejuez should simply go straight to the hospital if she began experiencing a panic attack.   Thus, at all relevant times VOA Persian Service management was fully aware of Ms. Lejuez's vulnerable, debilitated state due to her work-related anxiety and panic attacks.   Yet Dr. Sieg continued her tirades and abuse toward Ms. Lejuez.

14.   Despite the ongoing bullying from Dr. Sieg, the stress from the deadline-driven demands and the persistent panic attacks, Ms. Lejuez was able to competently perform the essential functions of her News Producer position.   In fact, during this period as a News Producer, Ms. Lejuez consistently received ratings of "exceeds expectations" and received a Superior Accomplishment Cash Award each year.   These awards are designed to provide monetary awards to employees in recognition of one-time exemplary contributions to the Government that result in tangible savings and/or intangible benefits.

15.   In or about August 2013, Ms. Lejuez was detailed by BBG for six months to VOA Africa Service at the request of Bert Kleinman, who wanted her assistance with launching two new FM radio stations in Africa.  Upon her return to VOA Persian Service in early 2014, Ms. Lejuez was promoted to Supervisory TV Production Specialist/Executive Producer (GS-13).  Dr. Sieg was elevated to the position Director of VOA Persian Service soon after Ms. Lejuez's return.

16.   The essential functions of Ms. Lejuez's Executive Producer position entailed developing VOA Persian Service programs; creating and managing the production process for programming; overseeing pre- and post-productions processes; booking high-level spokespersons as guests on programs; training staff members and on-air talent in details of program production; and supervising TV production specialists and TV broadcasters.  Ms. Lejuez's specific responsibilities as Executive Producer included producing "hard news" shows such as *News Hour*, broadcast daily in Farsi to Iran, and special shows on critical topics, such as the emerging US-Iran nuclear deal, the US Presidential Inauguration and State of the Union addresses and the elections in Iran.

17.   As of 2015, Ms. Lejuez was supervised in her position as Executive Producer by Mohammed Manzarpour, Senior Executive Editor (Persian male), with Dr. Sieg, the Director of VOA Persian Service, as her second-line supervisor.  Ms. Lejuez would also report on occasion to Jim Kennedy, Staff Director (African American male) and Aurea Nascimento, Operations Manager (Brazilian female).  While Executive Producer, Ms. Lejuez continued to be subjected to abuse from Dr. Sieg and continued to suffer panic attacks in the workplace.  Nevertheless, Ms. Lejuez ably performed the essential functions

of her position as Executive Producer, meeting the deadlines and job demands in this stressful deadline-driven environment.  In fact, Ms. Lejuez continued to receive annual ratings of "exceeds expectations" and in all areas and received a Superior Accomplishment Cash Award for FY 2015.

18.   With Dr. Sieg at the helm, VOA Persian Service began to devolve into dysfunction – poorly managed, often toxic, frequently chaotic.  Dr. Sieg would manage VOA Persian Service as her "fiefdom," retaliating with imperious disdain against any employee who would question her practices or decisions.  To surreptitiously improve her image, she would often order that negative comments about her on the VOA Persian Service website be deleted and would inflate the Service viewership numbers.  Since most of the employees and contractors are from Iran and speak Farsi, VOA Persian Service was set apart from the remainder of BBG/VOA and the standards of conduct applicable to federal employees seemed not to apply.  Moreover, many of the journalists at VOA Persian Services had no prior journalistic experience and were unaware of journalistic "best practices," exacerbating the frustrations of producing balanced and professional news segments in an already dysfunctional workplace.  Not surprisingly, at all relevant times, employee morale within VOA Persian Service was appallingly low, as evidenced by abysmal employee satisfaction scores for VOA Persian Service in agency-wide surveys.

19.   The criticisms of VOA Persian Service came not only from its employees – over the past several years, VOA Persian Service has been the subject of strident complaints of pro-Iranian regime bias from Members of Congress and Administration officials.  Indeed, as an Executive Producer, Ms. Lejuez often found she had to fight to air stories that were

deemed critical of the Iranian regime.  As a result, documented and irrefutable accounts of grotesque human rights abuses, such as mass hangings in public venues in Tehran, were left unreported.  In addition, VOA Persian Service, with the knowledge of Dr. Sieg, maintained an informal "black list" of commentators who were considered too critical of the Iran regime and thus not allowed on VOA Persian Service programs, further restricting the extent of viewpoints provided to the Iranian people.  In short, as many former and current employees will no doubt attest, VOA Persian Service, under the leadership of Dr. Sieg, has become a taxpayer-funded disaster, at a time when U.S.-Iran relations are at the forefront and effective programming to the people of Iran most needed.

20.    When it came to preventing and addressing sexual harassment, VOA Persian Service was particularly dysfunctional.  Sexual banter, even by management officials, was routine.  Misogynistic attitudes by male supervisors prevailed.  Even though most of the persons working at VOA Persian Service are contractors, contractors were not provided sexual harassment training.  Even some managers, including Ms. Nascimento, did not receive sexual harassment training.  To make matters worse, the BBG Sexual Harassment policy that was made available to employees was deficient in that, for instance, it did not clearly define sexual harassment; did not give specific examples of such unacceptable conduct; did not instruct employees on where complaints were to be submitted; and did not explain how complaints would be investigated or whether they would be treated as confidential.  And the BBG Human Resources personnel assigned to VOA Persian Service were widely regarded as inept, glacially slow, pro-management and hostile to employee

concerns.  It was within this context that the subject sexual harassment of Ms. Lejuez and subsequent retaliation occurred.

Sexual Harassment of Ms. Lejuez

21.   One contractor at VOA Persian Services, Babak Alipourkargar, had worked for years as a contractor for VOA Persian Service, providing video editing services.  Over those years, Mr. Alipourkargar had developed a widespread reputation within VOA Persian Service for engaging in sexually inappropriate, aggressive conduct toward women. Mr. Alipourkargar also had been disciplined for serious misconduct relating to dishonesty.

22.   Ms. Lejuez was personally aware of Mr. Alipourkargar's sexually aggressive conduct towards women in the workplace.  Before the events at issue, she had observed him touch women on the thigh or shoulder areas and had heard from co-workers about his sexually explicit comments.  On those limited occasions when she would interact with Mr. Alipourkargar, he would make inappropriate comments about her or touch her in sexually suggestive ways, *e.g.*, attempting to massage her shoulders.   Ms. Lejuez would immediately tell him to stop, making clear that these advances were unwelcome.  Mr. Alipourkargar was nonetheless insistent.  On one occasion in late 2013, the interactions with Ms. Lejuez took an ugly, threatening turn.  While on a cigarette break outside, he made taunting, gross sexual comments to Ms. Lejuez, telling her that she is the type of woman who likes to be tied up and have "rough sex" while moving his hands over his crotch area to show he was getting sexually excited.  Ms. Lejuez, obviously repulsed by this egregious, unwelcome behavior, immediately left the area.  When she returned to the office, she advised Leilani Soltani, a VOA Persian Services management official, of what

had just occurred.  On information and belief, Ms. Soltani took no steps to elevate these concerns about Mr. Alipourkargar's sexual conduct to appropriate personnel with VOA.

23.    As of early 2015, VOA Persian Service management had long been aware of Mr. Alipourkargar's sexually aggressive conduct.  Indeed, in early 2015 a female colleague of Ms. Lejuez had placed VOA Persian Service on notice of Mr. Alipourkargar's sexually aggressive behavior, advising Mr. Manzarpour, Ms. Lejuez's direct supervisor, that Mr. Alipourkargar had subjected her to gross sexual conduct.  Despite being placed on such notice, Mr. Manzarpour did not take any action to address this complaint by the female colleague and did not arrange for Mr. Alipourkargar to receive sexual harassment training.  As with the other contractors, Mr. Alipourkargar had not received any sexual harassment training while at VOA Persian Service.

24.    On February 20, 2015, Ms. Lejuez was assigned to produce a four-hour television documentary on Norooz, the Persian New Year celebration.  Ms. Nascimento informed Ms. Lejuez that she would be working with Mr. Alipourkargar on this project.  Ms. Lejuez immediately explained to Ms. Nascimento that she did not want to work with Mr. Alipourkargar, but Ms. Nascimento persisted.  Mr. Manzapour was made aware of this decision to have Ms. Lejuez work with Mr. Alipourkargar.  Even though he was aware of Mr. Alipourkargar's sexually aggressive behavior toward women, Mr. Manzarpour did not voice concerns about this working arrangement or take any steps to otherwise protect Ms. Lejuez from possible abuse.

25.    On or about March 16, 2015, Ms. Lejuez began working with Mr. Alipourkargar on the Norooz project.  True to form, Mr. Alipourkargar soon began to engage in acts of

sexual harassment toward Ms. Lejuez.  That same day, Mr. Alipourkargar told Ms. Lejuez in Farsi, in the presence of Mr. Manzarpour and co-workers Mandana Divsalar and Parisa Bazgir, that Ms. Lejuez had "put [her] finger in his asshole," *i.e.*, had been too demanding, a repulsively crude and obscene phrase that has especially vile connotations when said to woman in the Persian culture.  Mr. Manzarpour, recognizing the egregious offensiveness of this comment, demanded that Mr. Alipourkargar call Ms. Lejuez later that day to apologize.  Yet, even then, Mr. Manzarpour did not take any steps to assign another contractor to work with Ms. Lejuez or to otherwise separate them in the workplace; nor did he report this conduct by Mr. Alipourkargar to Human Resources for appropriate follow-up action.

26.   As a result of management's ongoing tolerance of his outrageous conduct, Mr. Alipourkargar's highly abusive behavior toward Ms. Lejuez continued unabated.  The next day, March 17, 2015, Ms. Lejuez was sitting at a table with Mr. Alipourkargar when he reached down and unzipped the side of one of her boots.  He then began suggestively stroking her calf while trying to remove her boot.  Shocked, Ms. Lejuez had to force him to stop by physically removing his hand from her leg.

27.   The following day, March 18, 2015, Mr. Alipourkargar was watching a woman on a Spanish language television show.  In Ms. Lejuez's presence, he began to discuss the attractiveness of the woman, leaned back in his chair with his eyes closed and proceeded to recount with sexual noises the lewd sexual acts he would like to perform with her.  Then he stated directly to Ms. Lejuez that if they were not both already married, he would "fuck' Ms. Lejuez "so good" that the stars would "scream" in pleasure.  By that point, his

harassment and egregious behavior – and management's failure to protect her – became too much for her to withstand.  Ms. Lejuez began to cry and shake with rage, screaming that she could no longer work with Mr. Alipourkargar.  Mr. Alipourkargar's response was to scream obscenities back at her.  Ms. Lejuez then became pale and her heart started to race.  She went directly to Mr. Manzarpour's office, where she found him with Ms. Soltani and Ms. Divsalar.  Ms. Lejuez started to recount what had just occurred with Mr. Alipourkargar and began having a panic attack.  She was placed on the floor while Ms. Soltani and Ms. Divsalar tried to comfort her.  Ms. Lejuez requested that Ms. Soltani get her purse and take out her anti-anxiety medications.  After a few minutes, Mr. Manzarpour, Ms. Soltani and Ms. Divsalar suggested that they all go outside for some fresh air.  While outside, Mr. Manzapour told Ms. Lejuez that he was going to advise Dr. Sieg about what had just happened.

28.    Soon thereafter, Ms. Lejuez left the building to meet her husband, who was waiting for her outside in their car.  When Ms. Lejuez saw him, she began crying and was distraught.   After he had calmed her down, Ms. Lejuez revealed to him the sexual harassment by Mr. Alipourkargar.  At her husband's urging, Ms. Lejuez called Ms. Soltani and asked her to come out to the car.  Ms. Lejuez then explained the details of what had occurred with Mr. Alipourkargar to Ms. Soltani.   At that point, Ms. Soltani agreed to accompany Ms. Lejuez back to the office so Ms. Lejuez could make a full complaint regarding the sexual harassment to Mr. Manzarpour.

Ms. Lejuez's Complaint of Sexual Harassment

29.   Ms. Lejuez and Ms. Soltani then returned to Mr. Manzarpour's office and met with both Mr. Manzarpour and Ms. Nascimento.  Ms. Nascimento's initial reaction was to criticize Ms. Lejuez for leaving the workplace before the piece on Norooz was finished, evidently unconcerned by Ms. Lejuez's traumatized state.   Ms. Lejuez proceeded to complain to Mr. Manzarpour and Ms. Nascimento about the humiliating sexual harassment to which she had been subjected by Mr. Alipourkargar.  Ms. Lejuez recounted, *inter alia*, Mr. Alipourkargar's comment about Ms. Lejuez putting her "finger in his asshole"; his lewd behavior involving her boot; and his highly offensive comments and actions regarding the woman on Spanish language television.  Ms. Lejuez was too embarrassed and humiliated to recount comments Mr. Alipourkargar's comments about wanting to "fuck" her.  Ms. Lejuez noted that it was well known that Mr. Alipourkargar had a reputation for sexually aggressive behavior toward women in the workplace and provided the names of two women who she believed may have been subjected to similar offensive behavior by Mr. Alipourkargar.

30.   After Ms. Lejuez provided this information, Mr. Manzarpour and Ms. Nascimento instructed her to report to work the next day, March 19, 2015, to continue working on the Norooz project, which had to be completed by March 20, 2015.  Ms. Lejuez was told she would be working with Roozbeh Mazhari, another contractor, to complete the project.  No mention was made of separating her from Mr. Alipourkargar in the meantime.

31.   The following day, March 19, 2015, Ms. Lejuez received an email from Tisha Elliott of Human Resources, asking for a meeting.  Ms. Lejuez went to Ms. Elliott's office

and told her in detail about the sexual harassment by Mr. Alipourkargar.  Ms. Lejuez then left the meeting and proceeded to work approximately 26 straight hours with Mr. Mazhari to finish the Norooz project by the next day, March 20, 2015.

<u>Management Retaliates Against Ms. Lejuez</u>

32.   The retaliation against Ms. Lejuez for her complaint of sexual harassment began almost immediately.  That Friday, March 20, 2015, Ms. Lejuez, having just worked 26 hours straight on the Norooz project, was confronted by Ms. Nascimento.  Ms. Nascimento demanded to know why Ms. Lejuez and the contractor needed to work so many hours to finish the project.  Ms. Lejuez explained that the project had fallen behind schedule due to Mr. Alipourkargar's ineptitude.  Ms. Nascimento's tone was aggressive, abusive.  Indeed, Ms. Nascimento's hostility towards Ms. Lejuez was so toxic that even Mr. Mazhari complained about it to other managers.

33.   Shortly thereafter, Ms. Lejuez went again to Ms. Elliott of Human Resources, this time to make a separate complaint of retaliation based on Ms. Nascimento's hostile conduct that day.  Ms. Elliott told Ms. Lejuez that this separate complaint of retaliation would be promptly investigated as well – in fact, Ms. Elliott promised that she would conclude the investigation within a week.  On information and belief, Human Resources did not conduct any investigation into this separate complaint of retaliation.  In any case, Ms. Lejuez was never apprised of the results of any such investigation.   Nor was she advised that steps had been taken to ensure that Ms. Nascimento or other managers would not retaliate against her further.

34.  As a result of this inaction by Human Resources, the retaliation by upper management against Ms. Lejuez for engaging in protected activity continued.  Indeed, VOA Persian Service upper management grew increasingly hostile, even accusatory, towards Ms. Lejuez, thereby creating a retaliatory hostile working environment.

35.  For example, in late March 2015 Ms. Lejuez attended a meeting with Dr. Sieg, Mr. Manzarpour, Ms. Nascimento and Ms. Divsalar where the possibility of Mr. Alipourkargar working during Ms. Lejuez's scheduled work hours was raised.  Ms. Lejuez was stunned that this possibility would even be contemplated, given her pending complaint of egregious sexual harassment against Mr. Alipourkargar.  Dr. Sieg scorned her concerns, stating that the work in the office should not be held up "just because two people can't get along."

36.  By way of further example, on Friday, April 17, 2015, Ms. Lejuez spoke by cellphone to Mr. Manzarpour, inquiring about the status of the investigation into her complaint of sexual harassment.  Mr. Manzarpour told Ms. Lejuez that she was to blame for the situation with Mr. Alipourkargar because she is "too beautiful."

37.  On yet another occasion, Ms. Lejuez and Ms. Divsalar were in a meeting with Mr. Manzarpour when a prominent Iranian journalist appeared on VOA Persian Service television in Mr. Manzarpour's office.  As Mr. Manzarpour was aware, Ms. Lejuez had previously dated the Iranian journalist.  Mr. Manzarpour proceeded to ask Ms. Lejuez if the Iranian journalist was "kinky" or "dirty" in bed – highly offensive and unwelcome sexual comments that only further revealed the utter callousness and insensitivity of Persian Services management toward complaints of sexual harassment.

16

Human Resources Conducts a Sham Investigation

38.   The investigation by VOA into Ms. Lejuez's complaint of sexual harassment was slow, inept, biased and woefully incomplete.   On information and believe, several fact witnesses were not interviewed by Human Resources; several that were interviewed were not provided a draft statement to review for many months; and other witnesses were pressured to quickly sign inaccurate draft statements.   Moreover, BBG/VOA failed to take adequate efforts to treat the investigation regarding this gross sexual conduct as confidential, as many people in the office were made aware of Ms. Lejuez's complaint.   In addition, BBG/VOA failed to take adequate corrective action during the investigation, in that, *inter alia*, it did not take sufficient measures to ensure that Ms. Lejuez and Mr. Alipourkargar would not have contact in the workplace.

39.   On April 20, 2015, Ms. Lejuez sent an email to Ms. Elliott with additional, highly significant information in support of her complaint of sexual harassment.   Specifically, the email recounted the incident in or about 2013 when Mr. Alikargarpour had made extremely lewd comments to Ms. Lejuez while they were outside for a cigarette break.   In the email, Ms. Lejuez requested that Ms. Elliott contact her to discuss this additional information.   But there was no follow up to this email by Ms. Elliott – no acknowledgment of the additional information, no effort to interview or otherwise follow up with Ms. Lejuez regarding this explosive information regarding Mr. Alipourkargar's prior sexual conduct.

40.   On April 30, 2015, Ms. Lejuez contacted an EEO Counselor to seek informal counseling regarding the subject harassment and retaliation at VOA Persian Service.

17

41.   In May 2015, Ms. Lejuez's counsel contacted Ms. Elliott, concerned about the inordinate delay in completing the investigation.  Ms. Elliott advised Ms. Lejuez's counsel that the investigation was still pending and that he would be advised when it concluded.

42.   On August 7, 2015, Ms. Lejuez filed a Formal Complaint with the BBG Office of Civil Rights regarding the sexual harassment and retaliation she had experienced at VOA Persian Service.

43.   On August 21, 2015, Ms. Lejuez was advised that BBG/VOA had completed its investigation into her complaint of sexual harassment back in June 2015 and had concluded that there was insufficient information to support her claim.  Neither Ms. Lejuez nor her counsel had been advised in June 2015 that the investigation had been concluded. The investigation evidently found that the allegations of sexual harassment could not be corroborated, citing, *inter alia*, the lack of any eyewitnesses.  Human Resources did not bother to meet with Ms. Lejuez to present the results of the investigation or to address any concerns she may have about continuing to work in the same office with Mr. Alipourkargar – she was simply told that Mr. Alipourkargar would be returned to his previous work schedule and that she would not be assigned to directly work with him. Nor did Human Resources bother to address Ms. Lejuez's allegation of retaliation by Ms. Nascimento on March 20, 2015.  On information and belief, Mr. Alipourkargar was not provided any sexual harassment training, even after being the subject of Ms. Lejuez's detailed complaint.   In essence, the investigation of Ms. Lejuez's complaint of investigation was a sham.

Ms. Lejuez Requests Medical Leave

44.   On May 14, 2015, Ms. Lejuez, on the advice of her doctor and with the urging of her husband, advised BBG/VOA that she was requesting medical leave due to the intolerable situation at VOA and her deteriorating mental health.  Ms. Lejuez's psychiatrist, Dr. Eisenberg, provided documentation to VOA, explaining that the egregious sexual harassment and retaliation at VOA Persian Service had significantly exacerbated Ms. Lejuez's underlying Severe Depression, Generalized Anxiety Disorder and Adjustment Disorder.  BBG/VOA granted Ms. Lejuez's request for FMLA leave, providing her twelve weeks of unpaid leave effective May 5, 2015.  When this FMLA leave period ended, Ms. Lejuez requested 12 additional weeks of leave as a reasonable accommodation as she was still struggling with her disabling medical conditions.  VOA granted this request, providing unpaid leave until October 29, 2015.

45.   As of October 2015, Ms. Lejuez's medical conditions had improved but she had significant trepidations about returning to the VOA Persian Service workplace.  On October 19, 2015, Ms. Lejuez, with the support of her psychiatrist, requested part-time work schedule as a reasonable accommodation for her ongoing disabling medical conditions.  This request was made to the BBG Office of Civil Rights, which handles VOA's requests for reasonable accommodations.  On October 29, 2015, Ms. Lejuez submitted a letter from Dr. Eisenberg in support of this request, which suggested that she be permitted, as reasonable accommodations, to work on a part-time basis or from home by telecommuting.

<u>Ms. Lejuez Returns to Work and is Subjected to Further Retaliation</u>

46.    Even though her request for part-time work as a reasonable accommodation was still pending, Ms. Lejuez decided to return to work on October 29, 2015, intent on doing everything possible to put this entire ordeal behind her and start afresh.    Unfortunately however, the blatantly improper actions by VOA Persian Service management personnel continued.    Ms. Nascimento – the very person who had been the subject of Ms. Lejuez's complaint of retaliation on March 20, 2015 – was assigned to be her direct supervisor.    In addition, her first day back, Ms. Lejuez was told she was no longer assigned to work as the Executive Producer for *News Hour*, the flagship daily news broadcast.    Rather, she was told that she would be working on producing talk shows, an obvious "step down" as these talk shows have lower viewership, are not "hard news" and thus are demonstrably less prestigious assignments.    In place of Ms. Lejuez, a non-disabled male colleague was assigned to work as the Executive Producer for *News Hour*.

47.    The next day, October 30, 2015, Ms. Lejuez expressed concern regarding this constructive demotion, stating in pertinent part in an email:

> I feel as though I am being essentially demoted.    According to my job description, I am a news producer.    That's what I did before I was on FMLA leave, as you know.    I produced one of our most important, widely-viewed news programs.    Now I am being told that "others" are handling my prior job and that I should shift to producing less substantive, less hard news type programs.    While I have asked for the reasonable accommodation of being allowed to work part-time, this was to work part-time in my news producer position.

In addition, on Ms. Lejuez's first day back at work, Ms. Nascimento suggested the possibility that Ms. Lejuez could work again sometime in the future with Mr. Alipourkargar.    Ms. Lejuez, appalled by this suggestion, responded forcefully in an email

that she would never feel comfortable working with a person who had so egregiously harassed her and that she was shocked that the same dismissive attitudes towards sexual harassment still persisted at the VOA.  Ms. Nascimento then retaliated further against Ms. Lejuez by ordering that she return to work full-time the next day, even though Ms. Lejuez's request for a part-time schedule as a reasonable accommodation was still pending.  Ms. Lejuez, already extremely anxious about returning to this workplace, suffered a panic attack that afternoon after receiving this hostile and retaliatory email from Ms. Nascimento.

48.   At about this time, Ms. Lejuez learned that she had not been recommended by management for a Superior Accomplishment Cash Award for FY 2016, even though the Norooz project had generated high praise.   Indeed, Ms. Lejuez had worked 26 hours straight (after being egregiously sexually harassed) in order to finish the project on time, whereas in years prior, when the Norooz project had been given to other producers, it had not been finished on time and VOA Persian Service had been forced to "go to black" on air.  Before Ms. Lejuez had complained of sexual harassment, she had been recommended by her supervisors every fiscal year to receive a Superior Accomplishment Cash Award.

<u>Ms. Lejuez seeks Medical Leave and Suffers Additional Harassment and Retaliation</u>

49.   On November 2, 2015, Ms. Lejuez's attorney advised BBG/VOA by email that Ms. Lejuez had suffered a debilitating panic attack after her attempt to return to work and had to be placed back on medical leave.  Notwithstanding this email from her attorney, Ms. Lejuez received a hostile email from Ms. Nascimento the next day, inquiring why Ms. Lejuez was not at work.   Ms. Lejuez explained that her attorney had advised BBG/VOA

of her panic attack and her need to be placed back on medical leave.  Ms. Nascimento's response was that Ms. Lejuez had no additional leave available.

50.  Over the next few weeks, Ms. Lejuez was seen by her primary care physician, Kavin Milani, M.D..  On November 24, 2015, Ms. Lejuez submitted a letter to the BBG Office of Civil Rights from Dr. Milani, confirming that Ms. Lejuez was disabled as she was substantially impaired in more than one major life activity and requesting that she be provided appropriate reasonable accommodations in order to perform the essential functions of her position.  Specifically, Dr. Milani opined that "Ms. Lejuez should be continued on whatever form of leave is appropriate as a reasonable accommodation until such time as her health conditions have been adequately treated and can be re-evaluated" and that she "requires at least four months of additional leave for these purposes."  Such request for medical leave is a recognized form of reasonable accommodation.

51.  On November 28, 2015, Mr. Manzarpour, Ms. Lejuez's former supervisor, contacted Ms. Lejuez via text messages, asking if they could talk immediately.  When Ms. Lejuez contacted him by telephone, Mr. Manzarpour explained he had been provided an affidavit with questions by an EEO investigator relating to Ms. Lejuez's Formal Complaint.  Mr. Manzarpour then proceeded to aggressively confront Ms. Lejuez, telling her he was incensed by the accusations of misconduct and neglect of duties she had made against him.  Mr. Manzarpour hurled ugly accusations against Ms. Lejuez in an obvious attempt to intimidate her and pressure her into dropping her Formal Complaint.  Ms. Lejuez responded to his tirade in an email dated November 29, 2015, which stated, in pertinent part, that she was "telling the truth about what [he] and others said after [she]

complained about Mr. Alipourkargar's sexual harassment" and that she would "not be made to feel intimidated or ashamed by [him] for telling the truth."

<u>VOA Denies Ms. Lejuez's Request for Reasonable Accommodations</u>

52.   On December 10, 2015, Ms. Lejuez and her attorney met with the BBG Office of Civil Rights to follow up on the request from Dr. Milani for approximately four more months of medical leave as a reasonable accommodation.   On December 30, 2015, Ms. Nascimento denied this request for additional leave as a reasonable accommodation on the basis that (1) the request was purportedly "open-ended" as there was no reasonably foreseeable end to her requested leave; (2) Ms. Lejuez would not be able to perform the essential functions of her position while on leave and (3) the position of a news producer "is not the job for an individual who may suffer from episodic panic and anxiety attacks." BBG/VOA's denial of Ms. Lejuez's request for reasonable accommodations was blatantly discriminatory and/or in retaliation for her protected EEO activity, and the bases cited for denying Ms. Lejuez's request were clearly pretextual.

53.   On January 6, 2016, Ms. Lejuez, through her counsel, responded to this denial of reasonable accommodations.   In a letter of that date, Ms. Lejuez's counsel explained to BBG/VOA (1) that she had requested, with supporting medical documentation, a defined period of approximately four month leave as a reasonable accommodation; (2) that she was clearly qualified to perform the essential functions of her job as a news producer after she returned from leave and, as such, should be returned to her position after her medical leave was over; (3)  that VOA's conclusion that an employee like Ms. Lejuez who suffers from "episodic panic and anxiety attacks" is *per se* unqualified to be a news producer was a

troubling and discriminatory position; and (4) that if VOA was not willing to return Ms. Lejuez to her news producer position, she requested to be reassigned to a position at the same grade or pay level and tenure within the same commuting area.  Ms. Lejuez provided her resume so VOA could determine an appropriate reassignment, as reassignment can be an appropriate form of reasonable accommodation.

VOA fails to engage in Interactive Reasonable Accommodation Process

54.   Thereafter, for a period of 10 months – from January 2016 through October 2016 – Ms. Lejuez was on leave with pay.  During this period, BBG/VOA failed to engage in any interactive process whatsoever with her regarding reasonable accommodations. Indeed, during this period Ms. Lejuez received no communications from BBG/VOA about, *inter alia*, any efforts to find an appropriate reassignment.  Nor did BBG/VOA attempt during this period to provide any type of temporary accommodation to Ms. Lejuez, as allowed under BBG/VOA's reasonable accommodation policies.

55.   Finally, on October 27, 2016, Ms. Lejuez reached back out to BBG/VOA, asking why there had been no interactive process for the last ten months and inquiring specifically as to any efforts to find her a reassignment.  Ms. Lejuez further asserted that BBG/VOA had discriminated and retaliated against her by determining she was not qualified to be reinstated to her news producer position because she was suffering from a disabling mental health condition.

56.   On November 16, 2016 – some 11 months after Ms. Lejuez had requested reassignment as a reasonable accommodation – BBG/VOA claimed that it needed additional medical information from Ms. Lejuez to explore reassignment.

57.  On December 16, 2016, Ms. Lejuez dutifully provided updated medical information in the form of a letter from Dr. Milani dated December 16, 2016.  In the letter, Dr. Milani stated that Ms. Lejuez, while still suffering from depression and anxiety, could resume work as a new producer "away from PNN [VOA Persian Service] at BBG provided that reasonable accommodations for [her] depression and anxiety are provided."

58.  On January 17, 2017, more than a month later and more than a year after requesting reassignment, BBG/VOA claimed it needed yet more medical information from Ms. Lejuez to address her reasonable accommodation request.  Once again, on February 6, 2017, Ms. Lejuez provided additional information from Dr. Milani which confirmed (1) that Ms. Lejuez suffered from work-induced anxiety and depression which can, when exacerbated, result in debilitating panic attacks; (2) that the harassment, hostile working environment and retaliation that she had suffered at PNN [VOA Persian Service] had caused her to suffer increased panic attacks and had worsened her underlying depression and anxiety; and 3) that she had made significant progress during her leave period and was able to return to being a news producer and to perform the essential functions of that position, so long as that position was not at PNN [VOA Persian Service], absent a substantial change among the leadership that had retaliated against her and no possibility of interacting with Mr. Alipourkargar.  Dr. Milani, aware of the sexual harassment and retaliation to which Ms. Lejuez had been subjected, obviously did not think it medically advisable for her to return to that same environment with the same supervisors at VOA Persian Service.

<u>Ms. Lejuez is removed from her Executive Producer Position</u>

59.   Ms. Lejuez's request for reassignment to a producer position within BBG/VOA as a reasonable accommodation was denied in February 2017.   In denying this reasonable accommodation, BBG/VOA claimed that Ms. Lejuez could not be assigned to other vacant producer positions within BBG/VOA because she did not have requisite language skills. This basis for denial was blatantly pretextual as producers at VOA are often assigned to work at foreign language services, even though they do not speak the foreign language at issue.   Indeed, Ms. Lejuez herself had been assigned previously to the African Service services at VOA, even though she did not speak any language specific to the regions covered by the Service.    Reassigning Ms. Lejuez to another producer position within BBG/VOA would have allowed her to continue her employment at the Agency and would have improved her future employment and career opportunities generally.

60.   Thereafter, on March 1, 2017, Ms. Lejuez received a Notice of Proposed Removal ("NPR") for Medical Inability to Perform.   On March 24, 2017, Ms. Lejuez, with her counsel, responded orally to the NPR in a presentation with supporting documents to VOA Director Amanda Bennett.   In the oral response, Ms. Lejuez and her counsel explained in detail, *inter alia*, why the NPR was without basis and part of a pattern of discriminatory and retaliatory actions by BBG/VOA in the wake of Ms. Lejuez's protected EEO activity.   Ms. Lejuez explained that she obviously had been able to ably perform the essential functions of her position as an Executive Producer for years, as evidenced by her superior job performance evaluations, and even though she was suffering from frequent

and debilitating panic attacks at the time.  Ms. Lejuez also explained why the denial of a reassignment as a reasonable accommodation was clearly pretextual.

61.    Despite the information presented at the oral response, Ms. Bennett, on behalf of BBG/VOA, removed Ms. Lejuez from federal service.  In a letter dated May 1, 2017, Ms. Bennett stated Ms. Lejuez was being removed from her position as Supervisory Television Production Special (Persian) effective May 6, 2017 due to alleged medical inability to perform the essential functions of my position.  Specifically, the decision stated, *inter alia*, that Ms. Lejuez was being removed because she continued to suffer from a medical condition and could not perform the essential functions of the position; that the Agency appropriately handled Ms. Lejuez's request for reasonable accommodation and adequately engaged in the interactive process; and that the Agency had undertaken efforts to find another vacant position to which Ms. Lejuez could be reassigned.  The reasons proffered for Ms. Lejuez's removal were a blatant pretext for BBG/VOA's discriminatory and retaliatory motives.    After receiving this decision, Ms. Lejuez, through her counsel, thereafter amended her Formal Complaint to include her removal as additional evidence of BBG/VOA discrimination/retaliation.

62.    At all times relevant hereto, Dr. Sieg, Mr. Manzarpour, Ms. Nascimiento and Ms. Bennett acted as agents for the Agency and/or with actual or apparent authority and/or within their respective scopes of employment and/or their actions or omissions as set forth herein were ratified by the Agency with knowledge of all material facts.

63.    The Agency's actions or omissions as alleged herein constitute willful misconduct, were in bad faith, were done with malice, were reckless, were in willful

disregard of the Agency's legal obligations toward Ms. Lejuez and were done with the intent to injure or harm Ms. Lejuez personally, professionally and economically.

64.    At all relevant times, Ms. Lejuez has suffered from a disability, as defined by the Rehabilitation Act, 29 U.S.C. § 791, *et seq*., in that her mental impairment has substantially limited one or more or her major life activities.  And at all relevant times, Ms. Lejuez has been able to perform the essential functions of her position as Executive Producer with appropriate reasonable accommodations.

65.    Ms. Lejuez has suffered significant pecuniary and non-pecuniary damages as a proximate result of, *inter alia*, Mr. Alipourkargar's sexual harassment; BBG/VOA's bad faith, wholly inadequate response to her complaints of sexual harassment and retaliation; the retaliatory hostile working environment to which she was subjected by VOA Persian Service management; VOA's unlawful denial of her requests for reasonable accommodations in the form of additional medical leave or reassignment; and her removal from BBG/VOA and the federal service.  Indeed, for some six months, Ms. Lejuez was on unpaid leave and has now lost the stability and future income of her federal employment. Moreover, her panic attacks and underlying anxiety were exacerbated by the egregious sexual harassment by Mr. Alipourkargar and the callous and immediate retaliation by management, a management that knew all too well how debilitated and vulnerable she already was due to her workplace-induced panic disorder.  To then go through the ordeal of being systematically retaliated against and discriminated against by management over the course of more than a year has left her feeling profoundly distressed and humiliated, further exacerbating her anxiety and panic disorder conditions.   Being removed from her

position has only deepened Ms. Lejuez's profound sense of betrayal toward the agency she once so ably and loyally served.  And perhaps most distressing to her, Ms. Lejuez is no longer able to fulfill her commitment to promoting human rights, women's rights and democratic principles to the people of her native Iran through the unparalleled instrument of the VOA, especially at this critical juncture of U.S.-Iran relations.  She was willing to bear the sacrifice of not being able to return to Iran, knowing the sacrifice for a worthwhile purpose, but now is left to bear the burden of her sacrifice without its benefit.  To date, Ms. Lejuez is unemployed and continues to suffer from a panic disorder.

66.   On information and belief, Mr. Alipourkargar is still employed as a contractor for VOA Persian Service where he continues to work with VOA Persian Service female employees.

## COUNT I

**Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 USC § 2000e, *et seq*. (Sexual Harassment/Hostile Work Environment)**

67.   Ms. Lejuez incorporates by reference each and every preceding paragraph, as though set forth in full herein.

68.   Ms. Lejuez belongs to a protected group on the basis of her sex (female).

69.   Ms. Lejuez was repeatedly subjected to conduct by Mr. Alipourkargar that was unwelcome, offensive and sexual in nature or directed at her because of her sex.

70.   This conduct complained of was sufficiently severe or pervasive to alter or affect a term, condition or privilege of Ms. Lejuez's employment by creating an abusive working environment.

71.     At all relevant times, Mr. Manzarpour, Senior Executive Editor; Director of VOA Persian Service; and Ms. Nascimiento, Operations Manager; and Ms. Nascimento were Ms. Lejuez's supervisors in that they were able to take tangible employment actions against her, *i.e.*, to effect a significant change in her employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in her benefits.

72.     Ms. Lejuez's supervisors, including Mr. Manzarpour, Dr. Sieg and Ms. Nascimiento, were aware of, or should have known, of Mr. Alipourkargar's past sexual harassment of women in the workplace and/or about the sexual harassment by Mr. Alipourkargar's of Ms. Lejuez, but failed to prevent or adequately respond to the notice of the sexual harassment and to take reasonable prompt and appropriate corrective action to remedy the sexual harassment.

## COUNT II

### Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 USC § 2000e, *et seq*. (Retaliation)

73.     Ms. Lejuez incorporates by reference each and every preceding paragraph, as though set forth in full herein.

74.     Ms. Lejuez engaged in an activity protected by Title VII of the Civil Rights Act of 1964 by complaining to her supervisors that she was being sexually harassed by Mr. Alipourkargar.

75.     At all relevant times, Mr. Manzarpour, Senior Executive Editor; Director of VOA Persian Service; and Ms. Nascimiento, Operations Manager; and Ms. Nascimento were Ms. Lejuez's supervisors in that they were able to take tangible employment actions

against her, *i.e.*, to effect a significant change in her employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in her benefits.

76.   Ms. Lejuez's supervisors took materially adverse actions against Ms. Lejuez, including constructively demoting her and eventually removing her from federal service.

77.   These actions would deter a reasonable employee from engaging in protected activity, including complaining about being sexually harassed.

78.   Ms. Lejuez's supervisors would not have taken these actions but for Ms. Lejuez's protected activity.

## COUNT III

**Retaliation in Violation of Title VII of the Civil Rights Act of 1964,
42 USC  § 2000e, *et seq*. (Retaliatory Hostile Work Environment)**

79.   Ms. Lejuez incorporates by reference each and every preceding paragraph, as though set forth in full herein.

80.   Ms. Lejuez engaged in an activity protected by Title VII of the Civil Rights Act of 1964 by complaining to her supervisors that she was being sexually harassed by Mr. Alipourkargar.

81.   At all relevant times, Mr. Manzarpour, Senior Executive Editor; Director of VOA Persian Service; and Ms. Nascimiento, Operations Manager; and Ms. Nascimento were Ms. Lejuez's supervisors in that they were able to take tangible employment actions against her, *i.e.*, to effect a significant change in her employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in her benefits.

82.   Ms. Lejuez's supervisors began treating her harshly and with clear retaliatory animus after she complained about being sexually harassed.   In this regard, these supervisors engaged in conduct toward Ms. Lejuez which was offensive and retaliatory and which had the cumulative effect of creating a hostile work environment, and these actions were taken because Ms. Lejuez had complained about being sexually harassed.

83.   The cumulative effect of these actions by her supervisors was sufficiently severe or pervasive to alter or affect a term, condition or privilege of Ms. Lejuez's employment by creating an abusive working environment.

84.   Ms. Lejuez's supervisors would not have engaged in such conduct but for Ms. Lejuez's protected activity.

## COUNT IV

### Discrimination in Violation of Rehabilitation Act, 29 U.S.C. § 791, *et seq.*

85.   Ms. Lejuez incorporates by reference each and every preceding paragraph, as though set forth in full herein.

86.    Ms. Lejuez suffered from a physical or mental impairment that qualifies as a disability within the meaning of the Rehabilitation Act, in that the impairment substantially limited one or more of her major life activities; she had a record of having such an impairment that substantially limited one or more of her major life activities; or was believed by her supervisors and employer to have an actual or perceived impairment, whether or not the impairment substantially limited one or more of her major life activities.

87.   At all relevant times, Ms. Lejuez was qualified to perform the essential functions of her job, with or without reasonable accommodations.

88.   Ms. Lejuez suffered adverse employment actions solely because of her disability.

## COUNT V

**Discrimination in Violation of Rehabilitation Act, 29 U.S.C. § 791, *et seq*.
(Denial of Reasonable Accommodation)**

89.   Ms. Lejuez incorporates by reference each and every preceding paragraph, as though set forth in full herein.

90.   At all relevant times, Ms. Lejuez suffered from a physical or mental impairment that qualifies as a disability within the meaning of the Rehabilitation Act, in that the impairment substantially limited one or more of her major life activities; she had a record of having such an impairment that substantially limited one or more of her major life activities; or was believed by her supervisors and employer to have an actual or perceived impairment, whether or not the impairment substantially limited one or more of her major life activities.

91.   BBG/VOA had notice of her disability.

92.   Ms. Lejuez sought reasonable accommodations from BBG/VOA, including leave without pay for a defined period and reassignment to a position that did not report to the very supervisors that retaliated against her.

93.   These requested accommodations were reasonable and Ms. Lejuez could have performed the essential functions of her designated position if she had been provided these accommodations.

95.   BBG/VOA failed to provide these reasonable accommodations; unreasonably failed to provide any other accommodations; and failed to engage in the interactive dialogue regarding reasonable accommodations mandated by the Rehabilitation Act.

101.   Providing Ms. Lejuez such reasonable accommodations would not have caused BBG/VOA undue hardship or caused it to incur more than *de minimus* costs.

102.   As a result of BBG/VOA's failure to provide her reasonable accommodations that were required under law, Ms. Lejuez suffered adverse employment actions, including being constructively demoted and eventually removed from federal service.

## COUNT VI

### Retaliation in Violation of the Rehabilitation Act, 29 U.S.C. § 791, *et seq.*

103.   Ms. Lejuez incorporates paragraphs by reference each and every preceding paragraph, as though set forth in full herein.

104.   Ms. Lejuez engaged in an activity protected by Rehabilitation Act by seeking reasonable accommodations for her disability.

105.   At all relevant times, Mr. Manzarpour, Senior Executive Editor; Director of VOA Persian Service; and Ms. Nascimiento, Operations Manager; and Ms. Nascimento were Ms. Lejuez's supervisors in that they were able to take tangible employment actions against her, *i.e.*, to effect a significant change in her employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in her benefits.

106.   Ms. Lejuez's supervisors and Ms. Bennett took materially adverse actions against Ms. Lejuez after she engaged in the protected activity of requesting reasonable accommodations for her disability, including constructively demoting her and eventually removing her from federal service.

107.   These actions would deter a reasonable employee from engaging in protected

activity, including requesting reasonable accommodations for a disability.

108.   Ms. Lejuez's supervisors and Ms. Bennett would not have taken these actions but for Ms. Lejuez's protected activity in requesting reasonable accommodations for her disability.

**WHEREFORE**, Ms. Lejuez respectfully requests that this Court:

(a)   Enter judgment in her favor on all Counts;

(b)   Award all available compensatory damages, including attorneys' fees and costs, in an amount to be proven at trial; and

(c)   Award such other and further relief as the Court deems appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS SO TRIABLE**

Respectfully submitted,

KIYONAGA & SOLTIS, P.C.

/S/

By: _____
Paul Y. Kiyonaga
D.C. Bar 428624
910 17th St., N.W., Suite 800
Washington, D.C. 20006
Phone: (202) 363-2776
Fax: (202) 363-2749
pkiyonaga@kiyosol.com

August 28, 2017